*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0160P (6th Cir.)
File Name: 00a0160p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

No. 98-1722

JAMES SMITHERS,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 97-80248—Avern Cohn, District Judge.

Argued: August 6, 1999

Decided and Filed: May 8, 2000

Before: BATCHELDER and COLE, Circuit Judges;
MARBLEY, District Judge.*

---

## COUNSEL

**ARGUED:** Andrew N. Wise, FEDERAL PUBLIC
DEFENDERS OFFICE, Detroit, Michigan, for Appellant.
Kathleen Moro Nesi, ASSISTANT UNITED STATES

---

* The Honorable Algenon L. Marbley, United States District Judge for
the Southern District of Ohio, sitting by designation.

1

ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Andrew N. Wise, FEDERAL PUBLIC DEFENDERS OFFICE, Detroit, Michigan, for Appellant. Kathleen Moro Nesi, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

MARBLEY, D. J., delivered the opinion of the court, in which COLE, J., joined. BATCHELDER, J. (pp. 21-46), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

ALGENON L. MARBLEY, District Judge. Appellant James Smithers was convicted of bank robbery in violation of 18 U.S.C. § 2113(a). Smithers now appeals various aspects of his trial, including the district court's exclusion of the testimony of an eyewitness identification expert, the limitation of Smithers's wife's testimony, and the district court's response to questions posed by the jury after it began deliberating. For the following reasons, we **REVERSE** the conviction below and **REMAND** this case for a new trial pursuant to the law set forth herein.

**I.**

On the morning of November 12, 1996, a man walked into the Monroe Bank and Trust in Terence, Michigan, and presented bank teller Teresa Marino a note. The note read, "I have a gun. Give me your large bills." Ms. Marino complied with the demand by turning over the money from her teller drawer. The robber asked for more money, and Ms. Marino unlocked her other drawer and gave him three packs of large bills totaling $3,400. When the robber repeated his demand for more money, Ms. Marino told him that was all she had, and he ran from the bank. The entire incident lasted about two minutes.

understanding but for the particularized resolution of legal disputes.

509 U.S. at 596-97.  I fear that the majority's opinion here will only undermine the balance between truth-seeking and fairness that the Rules have so carefully crafted, without adding much at all to the efficacy—at least in this circuit—of criminal justice.  Indeed, the majority here holds that "Expert testimony regarding eyewitness identification must be recognized as scientifically commensurate with all other psychological studies, and may often be a valid source of information to help jurors understand the factors that effect [sic] eyewitness identifications."  The effect of the majority's opinion is to establish the district court as the gatekeeper with discretion only to admit, but not to exclude, expert testimony relative to eyewitness identification.

For all of the foregoing reasons, I respectfully dissent.

Two other witnesses observed the robbery. The first, Debra White, was also working as a teller at the bank on November 12, 1996.  She was sitting at a desk behind Ms. Marino when she noticed an unfamiliar customer standing at Ms. Marino's teller station.   Ms. White looked away for a moment and when she looked back, the man grabbed the money and walked quickly out of the bank. Ms. White asked Ms. Marino if she had been robbed.  Learning that she had, Ms. White yelled that they had been robbed and went to lock the bank doors.  While doing so, she observed the robber getting into the passenger side of a car parked in the parking lot.

Timothy Wilson, the second witness, was a bank customer who walked into the bank at the same time as the robber.  The robber held the door open for him as they both entered the building.  Mr. Wilson saw the robber go straight to the teller and then leave the bank quickly.

Investigators from the Monroe County Sheriff's Department spoke to the witnesses that day.  Ms. Marino, who was approximately three feet from the robber, described him as a white male in his late twenties wearing a Nike jacket, baseball cap and sunglasses, over 6' 2" tall, 180-185 pounds, with long bushy dark hair, a moustache and a thin beard.  Ms. White described the robber as taller than average, with squinty eyes and wearing a bulky striped jacket. Ms. White described the car as a two-toned brown and black, late 1970's Monte Carlo, with a cream colored landau roof and an Ohio license plate.  Mr. Wilson recalled the robber as a very tall man, with a moustache and partial beard, wearing a baseball cap, dark sunglasses and a winter jacket.

The next day, officers of the Toledo Police Department noticed a vehicle fitting the description of the car used in the robbery at an apartment complex in Toledo. Monroe County Detective Thomas Redmond drove Ms. White to the vehicle, a 1976 Oldsmobile Cutlass, which she identified as the car used in the robbery.  The car was registered to James Smithers.

Officers then went to Smithers's home, where his wife, Josette Smithers, informed them that he was at his parents' house. The officers searched Smithers's apartment but found no incriminating evidence. They located Smithers at his parents' home, and he accompanied the police to his apartment. Smithers told the officers that he bought the vehicle from his brother-in-law, Steve Dallas, who still retained a set of keys to the car. Smithers also stated that on the morning of November 12, 1996, he had noticed his rear license plate was missing, so he had moved his front plate to the rear. He also claimed to have noticed gas missing from the car on other mornings; later, Smithers said that there was a hole in the gas tank. Smithers consented to a search of the car, which produced no incriminating evidence. Smithers voluntarily went to the sheriff's department where he provided handwriting samples and was photographed and fingerprinted. When photographing him, Detective Redmond noted Smithers's height as 6' 6 ½".

Detective Redmond prepared a photo spread of six photographs, including a photo of Smithers. On November 14, 1996, Detective Redmond showed the photo spread to Ms. Marino, Mr. Wilson and Ms. White. Ms. Marino and Mr. Wilson could not identify the robber from the photo spread. Ms. White picked out Mr. Smithers. Immediately after her identification, Ms. White told Ms. Marino that she had been able to identify the robber from the photo spread.

Smithers's handwriting exemplars were submitted to the FBI laboratory for analysis. The results were inconclusive. The demand note was submitted to the Michigan State Police Laboratory for fingerprint analysis. The analysis produced one identifiable print. The government claims the print was inconclusive; Smithers claims the analysis showed that the print did not belong to him.

Peter Smith, an FBI examiner who specializes in analyzing exhibits in photographic form, performed a height analysis of the robber depicted in the bank videotape. Mr. Smith concluded that the robber measured approximately 6' 5". Mr.

to be allowed to testify in every case in which eyewitness testimony is relevant. This would constitute a gross overburdening of the trial process by testimony about matters which juries have always been deemed competent to evaluate"); *United States v. Thevis*, 665 F.2d 616, 641 (5th Cir. Unit B 1982) ("To admit such testimony in effect would permit the proponent's witness to comment on the weight and credibility of opponents' witnesses and open the door to a barrage of marginally relevant psychological evidence"); *Sabetta*, 680 A.2d at 933 ("it would effectively invade the province of the jury and . . . open a floodgate whereby experts would testify on every conceivable aspect of a witness's credibility"). The logical conclusion of today's holding—if not its implicit intent—is likely to be precisely this type of snowball effect in our circuit.

Acutely aware of the dangers of permitting expert testimony without a rigorous performance of the gatekeeping function, *Daubert* observed:

It is true that open debate is an essential part of both legal and scientific analyses. Yet there are important differences between the quest for truth in the courtroom and the quest for truth in the laboratory. Scientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and quickly. The scientific project is advanced by broad and wide-ranging consideration of a multitude of hypotheses, for those that are incorrect will eventually be shown to be so, and that in itself is an advance. Conjectures that are probably wrong are of little use, however, in the project of reaching a quick, final, and binding legal judgment--often of great consequence--about a particular set of events in the past. We recognize that, in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations. That, nevertheless, is the balance that is struck by Rules of Evidence designed not for the exhaustive search for cosmic

Fulero's exclusion lies not with the district court's legal analysis but with Smithers's inadequate production.

The cases holding that expert testimony regarding eyewitness identification is too general and those finding that it comments too directly on witness credibility delimit the narrow range of circumstances in which this testimony is properly admissible. Unless a very small number of eyewitness identifications form the only evidentiary basis for a conviction, and the proffered testimony relates directly to the facts of the case without commenting on the eyewitnesses' credibility, the need for this testimony will simply not be so great that alternative means of cautioning the jury on this subject will not suffice. *See*, *e.g*, *Rincon*, 28 F.3d at 923-26. The existence of other inculpatory evidence will usually render any error in excluding the expert testimony harmless. *See Smith*, 736 F.2d at 1107; *Hall*, 165 F.3d at 1107-08; *Smith*, 156 F.3d at 1053-54; *Blade*, 811 F.2d at 465; *Moore*, 786 F.2d at 1313. Here, the fact that three witnesses identified Smithers adds to the probability of their accuracy. Moreover, the Government presented the identification of Smithers's car at the bank, the photo analysis showing that Smithers and the robber shared the rare characteristic of being over 6'5" tall, and a series of lies Smithers told police regarding his whereabouts. While this is not overwhelming evidence, it does alleviate considerably any concern that Smithers was convicted solely on the basis of erroneous eyewitness testimony.

The various failings in Fulero's proposed testimony accentuate the jurisprudential danger posed by the majority's opinion. Its tangible eagerness to find that the district court abused its discretion in excluding this testimony is likely to set a precedent requiring admission of evidence tending to erode further the jury's responsibility for making credibility determinations. Other courts have recognized this danger and steered clear of it. *See*, *e.g.*, *Alexander*, 816 F.2d at 169 ("Requiring the admission of the expert testimony proffered in *Moore* would have established a rule that experts testifying generally as to the value of eyewitness testimony would have

Smith also conducted a comparative analysis of the robber in the bank photos with a photograph of Smithers. He could neither positively identify nor eliminate Smithers as the bank robber.

On June 16, 1997, a grand jury returned an indictment charging Smithers with one count of bank robbery in violation of 18 U.S.C. § 2113(a).

On December 18, 1997, Smithers filed a ten-page motion *in limine* to determine the admissibility of certain expert testimony regarding eyewitness testimony. The district court commenced Smithers's jury trial on January 14, 1998. After the jury was empaneled, the district court heard argument on Smithers's motion *in limine*, and denied the motion, noting that everything an expert would have to say about eyewitness identification was within the jury's "common knowledge" The court stated that it would give an instruction on eyewitness testimony. Smithers's attorney requested permission to make a written proffer, which the court allowed.

The government presented its case, including eyewitness testimony from Ms. Marino, Ms. White and Mr. Wilson. Despite their prior inability to identify Smithers from a photo spread, Ms. Marino and Mr. Wilson identified Smithers as the robber in court. Ms. Marino and Ms. White testified that they did not notice that the robber had any distinguishing features. The government rested on January 16, 1998.

Smithers filed his renewed motion *in limine* and offer of proof, regarding expert testimony, on eyewitness identification on January 20, 1998. This proffer described the anticipated testimony of Dr. Solomon Fulero, a proposed expert on eyewitness identification. It noted that Dr. Fulero would "educate the jury about the general factors that may affect eyewitness accuracy," including the specific the issues of: (1) "detail salience" (the fact that eyewitnesses tend to focus on unusual characteristics of people they observe); (2) the relationship between the time that has passed since observing the event and the accuracy of recalling it; (3) the

effect of post-identification events on memory; (4) the fact that when one person both prepares and administers a photo spread, the likelihood of misidentification increases; (5) the "conformity effect" (the fact that witnesses' memories are altered by talking about the event with each other after it occurs); and (6) the relationship between a witness's confidence in her recollection and its accuracy. Regarding the issue of detail salience, the proffer stated that "[h]ad Mr. Smithers been the robber, the eyewitnesses would have observed and been able to recall the large scar on Mr. Smithers' [sic] neck."

After hearing oral argument on the Defendant's renewed motion, the district court ruled that it would exclude the expert testimony:

> [p]rimarily because it's late in the day. It should have been done much earlier. On the other hand, I think you've got a very good, if there's a conviction, I think you've made an excellent record that I've abused my discretion in failing to allow it, and I think there's a certain – I prefer to see it that way.

The court also opined that Dr. Fulero's testimony was "not a scientifically valid opinion," "a jury can fully understand that its [sic] got an obligation to be somewhat skeptical of eyewitness testimony," and "admission of Dr. Fulero's testimony is in this case is almost tantamount to the Court declaring the defendant not guilty as a matter of law. . . . [A]bsent the eyewitness testimony I don't think there's enough here to go to the jury." Finally, the district court remarked, "I'm also interested in seeing what a jury will do absent that expert testimony. It makes it a more interesting case. I recognize it's the defendant's fate that's at stake, but you can always argue for a new trial if he's convicted."

After this ruling, Smithers presented a few witnesses, including his wife, who attempted to establish an alibi defense. Ms. Smithers testified that Smithers was sleeping in their house from 3:00 a.m. to 11:30 a.m. the morning of November 12, and that as a light sleeper she would have

our legal system is the sole province of the jury. *See Greenwell*, 184 F.3d at 496; *Gacy*, 994 F.2d at 313-14; Murrian, *supra*, at 380. As illustrated above, a number of courts have cited this tenet as a basis for excluding eyewitness identification experts. That threat was also present in this case, as the majority points out, because Dr. Fulero proposed to testify, among other things, that the eyewitnesses "would have observed and been able to recall the large scar on Mr. Smithers' neck. That deformity would have been *more* memorable to the witnesses." The majority opinion says that the solution to this admittedly inadmissible testimony is simply to excise the offending language. This ignores the fact that at the second hearing, Smithers identified the scar as "the key issue that [Fulero] would address." Removing this aspect of Fulero's testimony would gut the remainder of the majority's reasoning as to why Fulero's testimony should have been admitted. Nor is this one sentence the only example of how Fulero's testimony would have stepped over the line. Smithers argued in his renewed motion that "Fulero would testify regarding the perception of the bank robber by [the witnesses] and how [various factors] *are directly related to the accuracy of their identification testimony*." (emphasis added). Again: "Fulero would thus testify that the photo spread procedures, and the witness' numerous meetings with the police, FBI, and each other, *would have directly influenced* the witness' ability to recall the particular characteristics of the bank robber with any degree of accuracy." (emphasis added). Other portions of the motion are phrased in a more appropriate form, indicating that Fulero would testify to research data as it relates to particular conditions experienced by the witnesses, leaving the application of that information to counsel and the jury. But these examples more than adequately justify the district court's conclusion that Fulero (who, incidentally, is also an attorney) would have acted as more of an advocate than a scientific expert in this case. The majority's decision merely to excise the offending portions of the testimony not only leaves very little testimony that is even arguably relevant, but relieves Smithers of his burden of proving that the testimony he proffered is admissible. Once again, the blame for

The presence of a person labeled an "expert" by the court in the witness stand inevitably carries the risk of jurors' accepting that person's testimony as scientifically irrefutable truth. This simple fact underlies the special importance given to the court's gatekeeping function with expert testimony, and it is in the majority's flat rejection of this concept that its reasoning is the shakiest. In its fifth footnote, the majority observes: "it appears the trial court thought the expert nature of the testimony would unduly impress the jury; this is an improper factor upon which to exclude expert testimony, for if this were the test, no expert could *ever* testify." While it may be correct as a hypothetical matter that exclusion of a witness solely because he was an expert would be an abuse of discretion, that is simply not what occurred here. Rather, the court reasoned that cross-examination and a jury instruction were preferable to permitting the jury to hear testimony that was only marginally relevant and demonstrably prejudicial to the Government. The court was in good company in this conclusion. *Daubert* itself observed that "[e]xpert testimony can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." 509 U.S. at 595. A number of other courts addressing eyewitness identification expert testimony have explicitly cited the expert's "aura of reliability" as a prejudicial factor weighing against its admissibility. *See Lumpkin*, 192 F.3d at 289; *Brien*, 59 F.3d at 276-77; *Blade*, 811 F.2d at 465; *United States v. Purham*, 725 F.2d 450, 454 (8th Cir. 1984); *Fosher*, 590 F.2d at 383-84 (collecting cases referencing the "aura of reliability"); *Downing*, 609 F.Supp. 784; *United States v. Collins*, 395 F.Supp. 629, 636-37 (M.D. Penn. 1975). The majority's citation-free asseveration on this subject is simply untenable.

Expert testimony on eyewitness identifications can also be unduly prejudicial when it is phrased so as to comment directly on the credibility of the eyewitness. No court in any context would allow one witness to testify to the credibility of another, because assessment of the credibility of witnesses in

heard her husband leave the apartment. Ms. Smithers also spoke about her husband's appearance, maintaining that Smithers weighed 245 pounds in November of 1996, is 6' 8" tall and has a four-inch long scar on the right front side of his neck.

The case was submitted to the jury on January 21, 1998. The next day, the jury returned a verdict of guilty. The district court sentenced Smithers on June 4, 1998, to a forty-one month term of imprisonment. Smithers timely filed a notice of appeal on June 8, 1998. Smithers now appeals various aspects of his trial, only one of which we address today: the exclusion of Dr. Fulero as an eyewitness expert.

## II.

Generally, a trial court's evidentiary determinations are reviewed for an abuse of discretion. *See United States v. Moore*, 954 F.2d 379, 381 (6th Cir. 1992).

Smithers argues that the district court's denial of his motion to introduce testimony by an identification expert warrants the reversal of his conviction. The crucial element of the government's case was eyewitness identification of the defendant and his car, Smithers argues, and Dr. Fulero's testimony involved a proper subject that would have been helpful to the jury in evaluating this issue. Smithers, therefore, contends that the decision to exclude this expert's testimony, to indulge the district judge in his rather eccentric courtroom experiment, was improper. The government counters that the district court's decision was well within its discretion. The district court properly excluded Dr. Fulero's testimony, the prosecution argues, based upon its lack of scientific validity, invasion of the jury's province, possibility of confusion and the tardiness of Smithers's proffer.

Courts' treatments of expert testimony regarding eyewitness identification has experienced a dramatic transformation in the past twenty years and is still in a state of flux. Beginning in the early 1970's, defense attorneys began to bring expert testimony into the courtroom. Then, courts were uniformly

skeptical about admitting such testimony, elaborating a host of reasons why eyewitness experts should not be allowed to testify. In the first case to address the issue, *United States v. Amaral*, 488 F.2d 1148 (9th Cir. 1973), the Ninth Circuit held that the district court did not err in excluding expert testimony regarding eyewitness identification because cross-examination was sufficient to reveal any weaknesses in the identifications. After that decision, a series of cases rejected similar evidence for a variety of reasons. *See, e.g., United States v. Purham*, 725 F.2d 450, 454 (8th Cir. 1984) (finding the question is within the expertise of jurors); *United States v. Thevis*, 665 F.2d 616, 641 (5th Cir. 1982) (reasoning that identification was adequately addressed through cross-examination); *United States v. Sims*, 617 F.2d 1371, 1375 (9th Cir. 1980) (finding no general acceptance in scientific community); *United States v. Fosher*, 590 F.2d 381, 383 (1st Cir. 1979) (ruling that the testimony would be prejudicial).

This trend shifted with a series of decisions in the 1980's, with the emerging view that expert testimony may be offered, in certain circumstances, on the subject of the psychological factors which influence the memory process. *See, e.g., United States v. Moore*, 786 F.2d 1308, 1313 (5th Cir. 1986) (finding that "[i]n a case in which the sole testimony is casual eyewitness identification, expert testimony regarding the accuracy of that identification is admissible and properly may be encouraged . . . "); *United States v. Downing*, 753 F.2d 1224, 1232 (3d Cir. 1985) (reasoning that "expert testimony on eyewitness perception and memory [should] be admitted at least in some circumstances"); *United States v. Smith*, 736 F.2d 1103, 1107 (6th Cir. 1984) ("The day may have arrived, therefore, when Dr. Fulero's testimony can be said to conform to a generally accepted explanatory theory."). State court decisions also reflect this trend. *See, e.g., State v. Buell*, 489 N.E.2d 795 (Ohio 1986) (overruling per se rule and holding expert testimony admissible to inform jury about factors generally affecting memory process). Indeed, several courts have held that it is an abuse of discretion to exclude such expert testimony. *See, e.g., United States v. Stevens*, 935 F.2d 1380, 1400-01 (3d Cir. 1991) (reversing and remanding for

cross-examination to inquire into the witness' opportunity for observation, his capacity for observation, his attention and interest and his distraction or division of attention" (internal quotations and citations omitted)). The witness's cross-examination testimony can then be framed as the defendant chooses in closing argument to maximize its potential to undermine the identification. *See Currie*, 515 S.E.2d at 339. What the defendant is unable to establish by these means—e.g., the counter-intuitive concept suggested by psychological research that confidence in one's recollection does not necessarily reflect accuracy—can be ably communicated by the court in its jury instructions. Instructions have an advantage over experts in that they can be informed by advances in social science research while communicating only those theories that are relevant to the facts of the case, and avoiding the extra delay and expense of producing and rebutting expert testimony, all without the imprimatur of scientific reliability that accompanies expert testimony. Certainly the utility of jury instructions in these situations was aptly demonstrated in this case, where the district court skillfully addressed Smithers's concerns by adopting an instruction specifically tailored to explain the possible deficiencies of the identifications in this case. In any event, given the utility of cross-examination and jury instructions combined, it is little wonder that the vast majority of appellate cases have found the choice of these mechanisms over expert testimony, even if the expert may have some particular insight that would not be otherwise revealed, not to be an abuse of the district court's broad discretion under *Kumho Tire, Daubert*, and Rule 702. *See Moore*, 882 F.2d at 1110-11; *Hall*, 165 F.3d at 1107; *Smith*, 122 F.3d at 1358-59; *Hicks*, 103 F.3d at 847; *Kime*, 99 F.3d at 884; *Ginn*, 87 F.3d at 370; *Rincon*, 28 F.3d at 925-26; *Jordan*, 983 F.2d at 938-39; *Curry*, 977 F.2d at 1051; *Blade*, 811 F.2d at 464-65; *Moore*, 786 F.2d at 1311-12; *Fosher*, 590 F.2d at 382; *McClendon*, 730 A.2d at 1115-16; *McMullen*, 714 So.2d at 370; *Gaines*, 926 P.2d at 662-63; *Buell*, 489 N.E.2d at 803-04; *Currie*, 515 S.E.2d at 339.

might help jurors reach better decisions. Juries have a hard time distinguishing "junk science" from the real thing, but aside from some tinkering with the expert testimony admitted at trial, this shortcoming has been tolerated. Jurors reach compromise verdicts, although they aren't supposed to. Juries return inconsistent verdicts, representing irrational behavior or disobedience to their instructions. Juries act in ways no reasonable person would act. This is the standard for granting judgment notwithstanding the verdict in a civil case, or acquittal after verdict in a criminal case, or reducing an award of damages, and there are plenty of occasions for these post-verdict correctives. Yet for all of this, courts do not discard the premises of the jury system, postulates embedded in the Constitution and thus, within our legal system, unassailable. This shows up in a striking fact about the Supreme Court's treatment of social science: of the 92 cases between 1970 and 1988 addressing issues of evidence and trial procedure, not one relied on the extensive body of evidence about jurors' conduct.

(citations omitted).

No psychological study will ever bear directly on the specific persons making an eyewitness identification in court; psychological experts will always be forced to extrapolate from studies done on other people and opine on the relevance such data might have to the facts at hand. Cross-examination of the identifying witnesses, on the other hand, will always provide more relevant testimony, because by definition the inquiry is limited to what the eyewitnesses themselves saw and experienced. *See Smith*, 122 F.3d at 1359 ("defendants who want to attack the reliability of eyewitness recollection are free to use the powerful tool of cross-examination to do so"). Indeed, to a certain extent, lawyers are abdicating their own roles when they seek to rely on experts instead of cross-examination to discredit an eyewitness identification. *See Amaral*, 488 F.2d at 1153 ("Our legal system places primary reliance for the ascertainment of truth on the test of cross-examination. [...] It is the responsibility of counsel during

new trial); *Smith,* 736 F.2d at 1107 (holding error harmless in light of other inculpatory evidence); *Downing*, 753 F.2d at 1232 (holding error harmless in light of other inculpatory evidence); *State v. Chapple*, 660 P.2d 1208 (Ariz. 1983) (reversing and remanding for new trial). This jurisprudential trend is not surprising in light of modern scientific studies which show that, while juries rely heavily on eyewitness testimony, it can be untrustworthy under certain circumstances.[1]

---

[1] A plethora of recent studies show that the accuracy of an eyewitness identification depends on how the event is observed, retained and recalled. *See generally* Roger V. Handberg, *Expert Testimony on Eyewitness Identification: A New Pair of Glasses for the Jury*, 32 AM. CRIM. L. REV. 1013, 1018-22 (1995). Memory and perception may be affected by factors such as:

> (1) the retention interval, which concerns the rate at which a person's memory declines over time; (2) the assimilation factor, which concerns a witness's incorporation of information gained subsequent to an event into his or her memory of that event; and (3) the confidence-accuracy relationship, which concerns the correlation between a witness's confidence in his or her memory and the accuracy of that memory. Other relevant factors include: (4) stress; (5) the violence of the situation; (6) the selectivity of perception; (7) expectancy; (8) the effect of repeated viewings; (9) and the cross-racial aspects of identification, that is where the eyewitness and the actor in the situation are of different racial groups.

Alan K. Stetler, *Particular Subjects of Expert and Opinion Evidence*, 31A AM. JUR. *Expert* § 371 (1989). Accordingly, "a jury should consider several factors in judging the accuracy of an eyewitness identification. Social science data suggests, however, that jurors are unaware of several scientific principles affecting eyewitness identifications." Handberg, *supra*, at 1022. In fact, because many of the factors affecting eyewitness impressions are counter-intuitive, many jurors' assumptions about how memories are created are actively wrong. *See Downing*, 753 F.2d at 1231 (finding that "[f]actors bearing on eyewitness identification may be known only to some jurors, or may be imperfectly understood by many, or may be contrary to the intuitive beliefs of most") (citations omitted). This ignorance can lead to devastating results. One study has estimated that half of all wrongful convictions result from false identifications. *See* Elizabeth F. Loftus, *Ten Years in the Life of an Expert Witness*, 10 LAW & HUM. BEHAV. 241, 243 (1986) (citing a 1983 Ohio State University doctoral dissertation). And "[i]t has been estimated

Recognizing the dichotomy between eyewitness errors and jurors' reliance on eyewitness testimony, this Circuit has held that expert testimony on the subject of eyewitness identification is admissible. In *United States v. Smith*, 736 F.2d 1103 (6th Cir. 1984), this Court held that a trial court abused its discretion in excluding such an expert. In *Smith*, the defendant sought to introduce the testimony of psychologist Solomon Fulero – the same expert Smithers attempted to introduce at his trial – as an expert in the field of eyewitness identification to shed light upon an eyewitness's testimony. The lower court excluded the testimony, finding that it was inadmissible pursuant to Federal Rule of Evidence 403. On appeal, this Court applied the four prong test for expert testimony articulated in *United States v. Green*, 548 F.2d 1261 (6th Cir. 1977): (1) that the witness, a qualified expert, (2) was testifying to a proper subject, (3) which conformed to a generally accepted explanatory theory, and (4) the probative value of the testimony outweighed its prejudicial effect.

---

that more than 4,250 Americans per year are wrongfully convicted due to sincere, yet woefully inaccurate eyewitness identifications." ANDRE A. MOENSSENS ET AL., SCIENTIFIC EVIDENCE IN CIVIL AND CRIMINAL CASES § 19.15, at 1171-72 (4th ed. 1995) (citing *United States v. Wade*, 388 U.S. 218 (1967)). A principal cause of such convictions is "the fact that, in general, juries are unduly receptive to identification evidence and are not sufficiently aware of its dangers." PATRICK M. WALL, EYE-WITNESS IDENTIFICATION IN CRIMINAL CASES 19 (1965). Many jurists agree that eyewitness identifications are the most devastating and persuasive evidence in criminal trials. *See, e.g.*, *Watkins v. Sowders*, 449 U.S. 341, 352 (1981) (stating that "[t]here is almost nothing more convincing than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!'") (Brennan, J., dissenting) (citations omitted); *Manson v. Brathwaite,* 432 U.S. 98, 120 (1977) (stating that "juries unfortunately are often unduly receptive to [identification] evidence") (Marshall, J., dissenting); Hon. D. Duff McKee, *Challenge to Eyewitness Identification Through Expert Testimony*, 35 AM. JUR. POF 3d 1, § 1 (1996) ("Eyewitness testimony may be the least reliable, and yet the most compelling."). Jurors tend to overestimate the accuracy of eyewitness identifications because they often do not know the factors they should consider when analyzing this testimony. *See* Handberg, *supra,* at 1022.

---

reconstructionists or DNA experts) typically focus on the data to which the scientific method is applied, which is subject to objective analysis. The certainty of the testimony of social scientists, however, is limited by the nature of their field. They typically base their opinions on studies of small groups of people under laboratory conditions; those studies are then interpreted and extrapolated to predict the likelihood that another person under similar but non-controlled conditions will manifest similar behavior. Each step of this analysis—the choice of sample and control groups, the conditions under which they are observed, the cause and nature of the observed behavior, and the likelihood that the observed behavior will be replicated by a different person in a non-controlled setting—is influenced by the personal opinion of the individual expert. Nor will there be much similarity between the persons typically studied by social scientists and the witnesses in any given criminal trial. The studies are virtually always based on college students or other readily available test subjects in a controlled environment (which are the most easily measurable), not individuals involved in real world incidents such as actual robbery victims. *See*, *e.g.*, *United States v. Hines*, 55 F.Supp.2d 62, 72 (D. Mass. 1999) (assessing relevance of studies of college students); Brian L. Cutler and Steven D. Penrod, *Assessing the Accuracy of Eye-Witness Identifications*, *in* HANDBOOK OF PSYCHOLOGY IN LEGAL CONTEXTS 193 (R. Bull and D. Carson ed. 1995) (Attachment E to Smithers's Motion *in Limine*) ("Most of what is known about the psychology of eye-witness memory has been acquired through laboratory experiments"). The limits of social science testimony were aptly expressed in *Gacy v. Welborn*, 994 F.2d 305, 313-14 (7th Cir. 1993):

> Social science has challenged many premises of the jury system. Students of the subject believe, for example, that jurors give too much weight to eyewitness evidence and not enough weight to other kinds. Still, the ability of jurors to sift good evidence from bad is an axiom of the system, so courts not only permit juries to decide these cases but also bypass the sort of empirical findings that

announce what facts about the testimony the court would have discovered in a hearing. Instead, we should follow the lead of our sister circuits which, upon a finding that the district court has not assessed an eyewitness identification expert's relevance in a manner consistent with Rule 702, have remanded the matter without further discussion. *See*, *e.g.*, *Hall*, 165 F.3d at 1102; *United States v. Amador-Galvan*, 9 F.3d 1414, 1417-18 (9th Cir. 1993); *Downing*, 753 F.2d at 1226. I take some comfort in the fact that the majority's *sua sponte* application of *Daubert* and glowing praise for eyewitness identification expert testimony are dicta, since they exceed the actual holding that the court abused its discretion. To the extent, however, that the opinion as a whole is seen as persuasive authority cementing the already-extant impression that our circuit is among the most receptive to this type of testimony, *see* Murrian, *supra*, at 392, it does our jurisprudence a disservice.

### III.  The Merit of Expert Testimony on Eyewitness Identifications

The trepidation with which nearly all appellate courts have treated this subject is representative of a broader reluctance, which I share, to admit the expert testimony of social scientists with the same deference given to the testimony of those in the physical sciences. I do not seek to discredit the value of these researchers' work; the ever-expanding psychological disciplines have done much in the past several decades to explode commonly held misconceptions and enrich our understanding of human behaviors. As even those courts most opposed to admitting the testimony in court have acknowledged, those benefits include an enhanced insight into the fallibility of eyewitness identification that can inform our trial procedures. *See*, *e.g.*, *Hall*, 165 F.3d at 1104. The difficulty arises in treating psychological theories as if they were as demonstrably reliable as the laws of physics. Conclusions reached by applying the laws of all but the most theoretical of physical sciences to a particular set of facts are verifiable through replication; disagreements between dueling experts in the physical sciences (e.g., accident

Applying that standard, the Court noted that the offered testimony would have been based on "a hypothetical factual situation identical" to the facts of the case and would have explained:    (1) that a witness who does not identify the defendant in a first line-up may "unconsciously transfer" his visualization of the defendant to a second line-up and thereby incorrectly identify the defendant the second time; (2) that studies demonstrate the inherent unreliability of cross-racial identifications; and (3) that an encounter during a stressful situation decreases the eyewitness's ability to perceive and remember and decreases the probability of an accurate identification. *See Smith*, 736 F.2d at 1105-06. The *Smith* Court held that expert testimony on the reliability of eyewitness identification met the "helpfulness" test of Federal Rule of Evidence 702 and therefore had been excluded improperly at trial. The Court explained that "[i]n reviewing a 403 balancing, the court must look at the evidence in the light most favorable to the proponent, maximizing its probative value and minimizing its prejudicial effect," *id.* at 1107, and concluded that "[s]uch testimony might have been relevant to the exact facts before the court and not only might have assisted the jury, but might have refuted their otherwise common assumptions about the reliability of eyewitness identification."  *Id.* at 1106.  Further, the *Smith* Court expressed its acceptance of psychological studies as a scientifically sound and proper subject of expert testimony, noting, "[t]he science of eyewitness perception has achieved the level of exactness, methodology and reliability of any psychological research." *Id.* at 1107.

Smith's conviction was nonetheless affirmed on the ground that any error by the district court in excluding the proffered testimony was harmless. The *Smith* Court noted that the government had not only presented three witnesses who identified the defendant as the perpetrator, but that the defendant's palm print was recovered at the scene of the crime, thus "wholly discrediting the defendant's alibi" defense. *Id.* at 1107-08. Because there was other significant inculpatory evidence, the trial court's error was deemed harmless, and the defendant's conviction was affirmed.

Smithers now argues that the proper standard for the admission of eyewitness expert testimony is that set out in *Smith*. We disagree. The significance of *Smith* in terms of evaluating expert testimony is questionable after the landmark decision of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). In *Daubert,* the Supreme Court articulated the test that trial courts must use in determining whether scientific evidence and testimony is admissible. According to *Daubert,* a district court must "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589. *Daubert* thus requires trial courts to perform a two-step inquiry. First, the court must determine whether the expert's testimony reflects "scientific knowledge," that is, the court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. Second, the court must ensure that the proposed expert testimony is relevant to the task at hand and will serve to aid the trier of fact. *See id.* The Supreme Court referred to this second prong as the "fit" requirement. *See id.*

Citing the concurring opinion of Justice Scalia's in *Kumho Tire Co. v. Carmichael*, 119 S. Ct. 1167 (1999), the Dissent proclaims that *Daubert* is not "holy writ" to evaluate proffered experts under Rule 702. While it is true that the *Daubert* factors "do not constitute a 'definitive checklist or test . . . ,'" *Kumho Tire*, 119 S. Ct. at 1175 (citing *Daubert*, 509 U.S. at 593), the Supreme Court did conclude that "[a] trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Id.* at 1176. The Court also stressed:

> We conclude that Daubert's general principles apply to the expert matters described in Rule 702. The Rule, in respect to all such matters, 'establishes a standard of evidentiary reliability.' . . . It 'requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility.' . . . And where such testimony's factual

was not indifference to the law, but an assurance that she had done well in preserving a record of her objection for appeal. The observation that admitting Fulero's testimony would have been "tantamount to the Court declaring the defendant not guilty as a matter of law" and that "absent the eyewitness testimony I don't think there's enough here to go to the jury" correctly describes the severely prejudicial effect that Fulero's testimony likely would have had on the Government's case. Finally, the court's "experiment" remark, while perhaps inappropriate, was made well after the motion had twice been denied and was the last statement made on the record before Smithers rested his case. It did not form the basis for the court's exclusion of Fulero, nor did it prejudice Smithers in any other way. I do not agree that this single comment can justify the majority's finding of a patent abuse of discretion.

The majority ultimately concludes that this case must be remanded for a new trial that, presumably, will include "a *Daubert* test,"[7] whatever that may be. Were that the extent of our holding, my difference of opinion with the majority would simply be a disagreement about what *Daubert* requires and how the district court should have proceeded here. But the majority does not stop there. Instead, it proceeds into a lengthy explanation of what the court might have found had it applied *Daubert* to the majority's liking. This, in my view, is wholly improper. Not only does this exceed our function as an appellate court, but it is anathema to the law that the majority had theretofore laid out; if the gatekeeping function is truly in the district court's discretion and requires a fact-finding hearing, and the district court in this case has failed to exercise that discretion as utterly as the majority concludes, then surely the record before us is inadequate to permit us to

---

[7] Of course, in order to perform a more detailed inquiry next time, the district court should have the discretion to require Smithers to present his witness for voir dire, or at least to make an effort to present a sufficiently detailed proffer in a timely fashion. Unfortunately, the majority's opinion would appear to curtail that discretion considerably, if, indeed, the majority's opinion leaves any room for the district court to perform any further inquiry at all.

order to alleviate the genuine concerns that Smithers had raised. The majority is resolute in its conviction that the district court failed to "apply *Daubert*," but it fails to explain how that court could have done any better with no more information than Smithers provided.

This case presents very few of the "narrow circumstances" identified by other courts in which this kind of expert testimony can be relevant. *See Smith*, 156 F.3d 1046, 1052; *Harris*, 995 F.2d at 535-36. There was no problem of cross-racial identification. The passage of time has been found to be a relevant factor when the recalled event occurred forty years prior, *see Krist v. Eli Lilly and Co.*, 897 F.2d 293, 297-98 (7th Cir. 1990), but not when the time lapse was a "routine" one of "merely" six years. *See Curry*, 977 F.2d at 1052. Here, the time between the robbery and Ms. White's positive identification of Smithers in the photo array was two days; the time between the robbery and the trial was only one and a half years. Moreover, although Smithers alleges that there was an unconscious transference of mistaken identifications among the witnesses, the court explicitly found that all the evidence presented at the hearing appeared to suggest otherwise.

Furthermore, the majority identifies its primary basis for finding an abuse of discretion as the court's "experiment" comment, explaining that "[b]asing an evidentiary decision on personal curiosity rather than applicable case law and the rules of evidence is a patent abuse of discretion." The fact that these offhand statements were made is unfortunate. We review them on the cold record, separated them from their context and texture, including the voice inflection and facial expressions of their delivery. But the proceedings described above make it clear that the district court did not base its exclusion of Fulero on the sinister whimsy that the majority imputes to it. The statements were made at the close of the second hearing, after the court had again denied the motion and instead awarded Smithers a strongly worded instruction. The court's comment to Smithers's counsel that she had "made an excellent record that I've abused my discretion"

basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge *must* determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'

*Id*. at 1175 (citations omitted) (emphasis added).

The Supreme Court in *Kumho* indicated that the standards set forth in *Daubert,* depending on the "particular circumstances of the particular case," *id.*, should be flexibly applied. Contrary to the Dissent, the Supreme Court's reasoning does not indicate that *Daubert* should be abandoned totally. This Court finds that in the case *sub judice*, given the expert and the testimony that was proffered, the standards of *Daubert* should have been applied.[2]

While it is true that several post-*Daubert* eyewitness identification cases have found that the exclusion of the testimony was not an abuse of discretion, *see, e.g., United States v. Hall*, 165 F.3d 1095 (7th Cir. 1999); *United States v. Smith*, 156 F.3d 1046 (10th Cir. 1998); *United States v. Smith*, 122 F.3d 1355 (11th Cir. 1997); *United States v. Kime*, 99 F.3d 870 (8th Cir. 1996); *United States v. Brien*, 59 F.3d 274 (1st Cir. 1995); *United States v. Rincon*, 28 F.3d 921 (9th Cir. 1994), the lesson from these cases is not that expert

---

[2]The Dissent finds that the Supreme Court's *Daubert* decision is:

> [n]ot 'holy writ' that the district court must invoke by name in order to pass our scrutiny.

Instead, the Dissent suggests that the district court should have instead relied on a pre-*Daubert* Third Circuit precedent, *United States v. Stevens*, 935 F.2d 1380 (3d Cir. 1991), and *United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985), as the standard for outlining the steps that Smithers should have followed in making his proffer to the Court. Apparently, the Third Circuit has provided what the Dissent characterizes as "holy writ," notwithstanding the fact that *Stevens* and *Downing* are pre-*Daubert* authority and that the proffer of testimony that these Third Circuit cases require does not meet *Daubert*'s standard for determining whether scientific evidence is admissible.

testimony on eyewitness identification is never appropriate; rather, the cases indicate that courts must consider whether the testimony would be helpful or confusing to the jury. The cases also discuss whether this type of testimony touched on the "ultimate issue" in the case and therefore usurped the jury's role; whether there was other evidence against the defendant; and whether the jury could more properly evaluate the reliability of eyewitness testimony through cross-examination. In light of these cases, we believe that the district court should have performed its analysis under the rule of *Daubert*, rather than, as Smithers argues, that of *Smith*. In any event, the trial court did not analyze the admissibility of the expert testimony in this case under *either* of these cases.

We find that the district court abused its discretion in excluding Dr. Fulero's testimony, without first conducting a hearing pursuant to *Daubert*. There are several bases for this conclusion. As a threshold consideration, we address the district court's "experiment" comment. The district court explained that it was interested in seeing what a jury would do absent the expert testimony because it would make the trial "more interesting." The district court stated:

> I'm also interested in seeing what a jury will do absent that expert testimony. It makes it a more interesting case. I recognize it's the defendant's fate that's at stake, but you can always argue for a new trial if he's convicted.

This comment is gamesmanship at its worst and reveals a troubling disregard for this Defendant's rights, relegating those rights to mere abstractions. The district court's reasoning that it could indulge in this experiment because Smithers could "always appeal" ironically turned this trial into a laboratory experiment where the judge felt free to play with evidentiary variables at the cost of the Defendant's rights. Basing an evidentiary decision on personal curiosity rather than on applicable case law and the rules of evidence is a patent abuse of discretion.

indeed, is precisely the kind of proceeding that *Kumho Tire* expressly gives the district courts the discretion to avoid.

The majority acknowledges that although the district court did not explicitly explain that it was doing so, it did conduct some inquiry into relevance when it decided that the jury was aware of its obligation to be skeptical of eyewitness testimony. The record of the second hearing, however, reveals that the district court in fact looked carefully at the issue of relevance. Even at this point, Smithers did not make Dr. Fulero available for voir dire by the Government, but the court initiated a lengthy discussion with Smithers's counsel on Fulero's familiarity with the facts of the case, including Smithers's scar, the photo lineup procedure, and the stress of the robbery. These are precisely the questions the district court needed to ask to determine the relevance and "fit" of Fulero's testimony to the particular facts of the case. After hearing Smithers's answers, the court concluded that Fulero would have acted in this case as more of an advocate than a neutral, scientific expert—a characterization borrowed from *Rincon*. *See* 28 F.3d at 923. The majority fails to suggest any means whatever by which the court could have conducted a better inquiry under the circumstances. Instead it flatly pronounces that the court's conclusion was "simply wrong" because it would lead to the "absurd" result of never allowing such expert testimony.

I suspect that the Seventh and Eleventh Circuits might take umbrage at the majority's characterizing as "absurd," their strong presumptions against expert testimony regarding eyewitness identifications, *see Hall*, 165 F.3d at 1103; *Smith*, 122 F.3d at 1357. More importantly, I think it is the majority's conclusion that is simply wrong. The majority fails to explain how this extreme result would follow from the district court's observation. Indeed, if the district court meant flatly to disallow expert testimony concerning eyewitness identifications, it would not have gone out of its way at this hearing to replace *sua sponte* the pattern jury instruction on eyewitness identifications to which Smithers had already agreed with what it saw as "a much stronger instruction" in

28 F.3d 921 (9th Cir. 1994) and our decision in *United States v. Smith*, 736 F.2d 1103 (6th Cir. 1984) (per curiam). The Government's brief went further to explain why the testimony would be unhelpful and prejudicial in this case, and why cross-examination and jury instructions would better address Smithers's concerns. The court demonstrated its reliance on these briefs when it began the relevant portion of the motion hearing by noting its belief that the Government's arguments were persuasive, informing Smithers that he could discredit the eyewitness identifications through cross-examination, and asking for Smithers's assistance in choosing an appropriate jury instruction. As recounted above, the court pressed Smithers for additional details on how Fulero's testimony would relate to the facts of the case, but no such details were forthcoming. This left the court with little basis upon which to conclude that the Government was in error in its contention that the testimony would only confuse the jury and invade its province by commenting directly on the credibility of the witnesses. Whether Smithers was unable to demonstrate the relevance of the testimony at this hearing on the first day of trial or was simply procrastinating, the onus should fall on him; the court dealt appropriately with the information and arguments presented to it.

The court also acted properly once Smithers—at the close of his defense—finally proffered the details of Fulero's testimony. At one point during the hearing on the renewed motion to permit Fulero to testify, the court— addressing the prosecutor—explained its reliance on *Rincon*, and noted, consistent with the "reliability" element of *Daubert*, that "the good professor in his affidavit and in his background and in the literature that was cited to me suggests that the fragility . . . of eyewitness testimony has been established scientifically and that he brings an expertise that may assist the jury." How the majority can hold, in light of this statement and the Government's decision not to challenge Fulero's competence, that "the district court did not make *any* determination as to this expert's scientific reasoning or methodology" is puzzling. And because reliability was never at issue, any further inquiry into the reliability of the testimony was unnecessary and,

We do not, however, base our decision on the district court's "experiment" comment alone. Even without this comment, the district court erred in its evidentiary analysis by failing to apply the *Daubert* test to the proposed expert testimony. Although the decision of whether to admit a witness's testimony is left to the sound discretion of the trial court, a trial court cannot make an arbitrary decision. When a defendant's liberty is at stake, it is incumbent upon the trial court to apply the correct law, follow the appropriate decision-making steps and articulate the bases upon which its decision rests. Here, the district court should have applied the analytical principles set forth in *Daubert*, but it did not.

Under *Daubert*, a trial court should consider: (1) whether the reasoning or methodology underlying the expert's testimony is scientifically valid; and (2) whether that reasoning or methodology properly could be applied to the facts at issue to aid the trier of fact. The district court, in neglecting to undertake a *Daubert* analysis, failed to take these factors into consideration. Indeed, the district court did not make *any* determination as to this expert's scientific reasoning or methodology. We find that if the district court had given this issue proper consideration, it may have deemed Dr. Fulero's testimony scientifically valid.

Following *Kumho Tire*, 119 S. Ct. at 1176, we next consider the way the district court may have examined the *Daubert* factors in the present case. Tellingly, this Court has already accredited Dr. Fulero's science and methodology. In *Smith,* this Court not only noted the jurisprudential movement toward admitting psychological studies of eyewitness experts in general, but praised the qualifications and scientific methods of this same expert witness, Dr. Fulero. In addition, the district court could have concluded that this testimony — describing psychological factors such as detail salience, the conformity effect, the dynamics of photo identifications and the confidence-accuracy relationships — could have been applied to the facts at issue in this case. Information about the effects of detail salience would bear on the witnesses' failure to notice Smithers's conspicuous scar; evidence about the

conformity effect would apply to Ms. Marino's and Mr. Wilson's ability to identify Smithers only after they had spoken with Ms. White; the suggestibility of photo identifications created and administered by a single person would apply to the procedures that Detective Redmond used; and explaining the lack of correlation between confidence and accuracy would bear upon the credibility of all of the eyewitnesses. Had the district court conducted a proper evaluation of this testimony, we believe it may have found that Dr. Fulero's testimony met the first requirement of the *Daubert* test.

The trial court should have next considered whether the proposed expert testimony was relevant to the task at hand and would aid the trier of fact. The district court did, to some extent, discuss this second *Daubert* prong (even if it did not explicitly note that it was doing so), by stating that "a jury can fully understand" its "obligation to be somewhat skeptical of eyewitness testimony." This point addresses whether the testimony would "aid the trier of fact." The court's statement, however, is simply wrong, and the district court, on remand, should reconsider this factor. As noted above, jurors tend to be unduly receptive to, rather than skeptical of, eyewitness testimony. Further, accepting the district court's analysis that all jurors are aware of their obligation to be skeptical would lead to absurd results: expert testimony on eyewitness identification would *never* be admissible. As demonstrated by abundant case law, this is not the conclusion that has been reached by courts addressing this issue. Today, there is no question that many aspects of perception and memory are not within the common experience of most jurors, and in fact, many factors that affect memory are counter-intuitive. In *Smith* we recognized the expediency of expert testimony to address these complex issues and to inform jurors fully of the issues they must decide.

The Dissent counters by arguing that eyewitness identification experts are not necessary because cross-examination and jury instructions should be the tools used in a trial to discredit and flush-out eyewitness testimony.

referenced the decision). Instead, our task is to review the district court's performance of its gatekeeping function in light of "the facts of [the] particular case," *Kumho Tire*, 119 S.Ct. at 1175 (internal quotations omitted), granting "the trial judge [ ] considerable leeway in deciding in [this] particular case how to go about determining whether [this] particular expert testimony is reliable." *Id.* at 1176. In so doing, we must be mindful of the principles behind *Daubert*, but "the factors it mentions do not constitute a definitive checklist or test." *Id.* at 1175 (internal quotations omitted).

I would hold that the way in which the district court conducted its analysis of the admissibility of Dr. Fulero's testimony was not abusive of the court's discretion. The core holding of the *Daubert* decision was that admission of expert testimony is governed by the Federal Rules of Evidence and not the theretofore majority rule of "general acceptance" by the scientific community. *See Daubert*, 509 U.S. at 587. The primary "locus" of the court's power to evaluate experts rests in Rule 702. *See id.* at 589. Rule 702 requires that the testimony be reliable and relevant to be admitted. Because the Government has chosen not to contest Dr. Fulero's qualifications as a psychologist or the abstract scientific validity of the studies he proposes to testify from, either at trial or on appeal, we may assume that Smithers has satisfied the reliability requirement. *See Greenwell*, 184 F.3d at 498. Instead, the Government has consistently focused its challenge on the relevance aspect of Rule 702, which "further requires that the evidence or testimony assist the trier of fact to understand the evidence or determine a fact in issue. [...] The consideration has been aptly described . . . as one of 'fit.'" 'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Daubert*, 509 U.S. at 591 (internal quotations omitted). The district court here examined briefs on the issue from both sides in preparation for the hearing on Smithers's *limine* motion. Both briefs recited the applicable factors from *Daubert* and Rules 702 and 403. Both examined the leading cases on this type of testimony, both before and after *Daubert*, focusing especially on *United States v. Rincon*,

The trial court must have the same kind of latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable.  Our opinion in *Joiner* makes clear that a court of appeals is to apply an abuse-of-discretion standard when it reviews a trial court's decision to admit or exclude expert testimony. That standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion.  Otherwise, the trial judge would lack the discretionary authority needed both to avoid unnecessary "reliability" proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises.   Indeed, the Rules seek to avoid unjustifiable expense and delay as part of their search for truth and the just determination of proceedings.  Thus, whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine.  And the Eleventh Circuit erred insofar as it held to the contrary.

*Kumho Tire*, 119 S.Ct. at 1176 (internal citations, quotations and alterations omitted).  The court's failure specifically to cite *Daubert* as its basis for excluding Dr. Fulero does not itself mandate remand.  *See Greenwell v. Boatwright*, 184 F.3d 492, 498 (6th Cir. 1999) ("Although the trial court is not required to hold an actual hearing to comply with *Daubert*, the court is required to make an initial assessment of the relevance and reliability of the expert testimony. Because the district court did not hold a *Daubert* hearing we must review the record to determine whether the district court erred in its assessment of the relevance and reliability of the expert testimony"); *see also Hall*, 165 F.3d at 1102 (approving of the district court's evaluation of the testimony in a hearing that did not explicitly cite the two *Daubert* prongs but frequently

Unfortunately, the Dissent's homage to trial procedures does not extend to expert witness testimony.  The same argument can be made for the admission of expert testimony:  cross-examination and jury instructions can be used to question the qualifications of the proffered expert, undermine the basis of the expert's theories, explain the limits of social science's validation studies and pick apart research methods. The only reason given by the Dissent for why cross-examination and jury instructions can serve these goals for eyewitness testimony, but not for expert testimony, is that the jury may take the expert's testimony as "scientifically irrefutable truth." The Dissent's selective faith in the collective intelligence, common sense and decision-making ability of the jury is disheartening, and is also inconsistent with the Dissent's deference to the jury on other matters, including judging the credibility of eyewitness identifications.

Further, based on the comment that Smithers's proffer of Dr. Fulero's testimony was "too late in the day," the Dissent crafts a legal basis for the district court's exclusion based on Federal Rule of Evidence 403.  The Dissent concludes that Rule 403 permits the exclusion of relevant evidence based on "delay."  FED. R. EVID. 403.  The Dissent misquotes and misconstrues the meaning of "delay" in Rule 403.  Not all delay authorizes the exclusion of relevant evidence – only "undue delay."  Moreover, the term "delay" does not connote delay in the submission of motions or proffers; rather, it encompasses the prolonging of the length of the trial, and can be read properly in conjunction with the other exclusionary factors:   "waste of time, or needless presentation of cumulative evidence."   *See, e.g., John McShain, Inc. v. Cessna Aircraft Co*., 563 F.2d 632 (3d Cir. 1977); *United States v. International Bus. Mach.*, 87 F.R.D. 411 (S.D.N.Y. 1980); *SCM Corp. v. Xerox Corp.*, 77 F.R.D. 10 (D. Conn. 1977).

"Delay" is a consideration of efficiency and is not readily distinguishable from "waste of time."  CHARLES ALAN WRIGHT & KENNETH W. GRAHAM JR., FEDERAL PRACTICE AND PROCEDURE:  EVIDENCE § 5218 (1978); *see also*

CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, EVIDENCE § 4.5 (1995) (concluding that "undue delay, waste of time or needless presentation of cumulative evidence" are concerns for the "concessions to the shortness of life," "the limited resources of the judicial system," and the presentation of cumulative evidence) (footnote omitted). "Delay" in Rule 403 does not mean "filed late" as the Dissent concludes.

Furthermore, the cases cited by the Dissent to support the contention that the basis for the district court's exclusion of Dr. Fulero's testimony was a consideration of "delay" under Rule 403 do not explicitly cite to the Rule nor do they mention delay as a factor. *See United States v. Curry*, 977 F.2d 1042, 1052 (7th Cir. 1992); *United States v. Dowling*, 855 F.2d 114, 118 (3d Cir. 1988).

The exclusion of Dr. Fulero's testimony because the evidence was presented "late in the day," contrary to the Dissent's assertion, was not a proper basis for exclusion. First, the Defendant filed his ten-page motion *in limine* requesting a ruling on this issue a full month before trial. At the beginning of trial, Smithers renewed his motion orally. A week later, he submitted an additional seven-page brief on the subject. Thus, it is impossible to say that either the court or the government did not have adequate notice of the issue. Second, "a criminal defendant's relevant evidence may generally not be excluded on the basis of a discovery sanction. The defendant's Sixth Amendment right to an effective defense will usually outweigh the interest served by pretrial discovery orders." *United States v. Collins*, No. 87-5077, 1988 WL 4434, at *2 (6th Cir. Jan. 25, 1988). Given the importance of eyewitness testimony in this case, the district court should not have excluded Dr. Fulero's testimony based on its supposed tardiness.[3]

---

[3]The government argues additionally that Smithers's proffer demonstrates that the expert testimony would have invaded the jury's province. Specifically, the government points to the sentence in the proffer which states, "Had Mr. Smithers been the robber, the eyewitnesses would have observed and been able to recall the large scar on Mr.

"a criminal defendant's relevant evidence may generally not be excluded on the basis of a discovery sanction." The *Collins* court expressly distinguished the case from one determining whether such evidence was admissible pursuant to our then-recent *Smith* decision. In fact, the *Collins* court followed *Smith* in declining to rule that the testimony was admissible as a matter of law, and proceeded to find the error harmless in light of other evidence. *See id.* at **2. *Collins*, then, is completely inapposite to this case, which involves an admissibility determination and not a discovery sanction. Moreover, reliance on unpublished cases in a subsequent written opinion for purposes other than establishing preclusion or law of the case, unless the prior case is truly of such precedential value that it probably should have been published, does violence to the policy we have promulgated in 6. Cir. R. 28(g). This dubious use of *Collins* will only have the unfortunate side effect of encouraging lawyers to cite other unpublished decisions to us in the future, despite the clear intent of the rule.

## II. The District Court's Application of *Daubert*

The majority finds that the district court abused its discretion by failing to apply the evidentiary gatekeeping principles of *Daubert*. I am not convinced that the court committed this error, or that remand would be necessary even if it did.

The majority pays passing obeisance to the abuse of discretion standard by which we review a district court's decision to exclude expert testimony, but wholly fails to apply in this case the deference that standard requires. The factors listed in *Daubert* were meant to suggest to federal courts the relevant subjects of analysis when evaluating proffered experts under Rule 702, but they are "not holy writ" that the district court must invoke by name in order to pass our scrutiny. *Kumho Tire Co. Ltd. v. Carmichael*, 119 S.Ct. 1167, 1179 (1999) (Scalia, J., concurring). The Supreme Court has recently instructed that

notice given); *United States v. Dowling*, 855 F.2d 114, 118 (3d Cir. 1988) (upholding exclusion when 5 days notice given in trial held in the Virgin Islands); *see also* Hon. Robert P. Murrian, *The Admissibility of Expert Eyewitness Testimony Under the Federal Rules*, 29 CUMB. L. REV. 379, 395-96 (1998-99) (instructing practitioners that "The offer of proof should establish the factors in the particular case which call for expert testimony, such as the extreme stress of the witness, differences in age or race of the defendant and the eyewitness, and suggestive line up techniques. If the factors necessitating expert testimony are not established, and the court excludes the expert testimony, the decision will likely be upheld on appeal"). These decisions and commentary contradict the majority's blanket statement that delay is "not a proper basis for exclusion."[6]

It is important to note that the majority relies solely on *United States v. Collins*, No. 87-5077, 1988 WL 4434 (6th Cir. Jan. 25, 1988) (per curiam) (unpublished), for the proposition that tardiness is not a proper basis for exclusion of expert testimony. This use of *Collins* is both misleading and inappropriate. In *Collins*, which is not only unpublished but is pre-*Daubert*, the defendant proffered a psychologist who would testify that the tendency to fill in gaps in perception made the eyewitness identifications in the case unreliable. *See id*. at **1. The district court excluded the witness for only one reason—he had not been listed as a witness as instructed by a pretrial order. No admissibility determination of any kind was made. The witness was therefore excluded *solely* to punish the defendant for noncompliance with a discovery order. It was in this context that the court made the statement quoted by the majority here:

---

[6] As I believe my discussion here makes clear, I understand "delay" to mean "prolonging of the length of the trial," and not, as the majority suggests I mean, merely "filed late." This certainly appears to have been the district court's understanding as well, since its ruling was made immediately before Smithers rested his case, and granting the motion would have required a "lengthy voir dire," more preparation by the Government, and the direct and cross-examination of Dr. Fulero.

---

Finally, we find that the trial court's error was not harmless. The complexion of the proceedings likely would have changed had the district court conducted a *Daubert* hearing and determined that Dr. Fulero's testimony was admissible. And, as the Dissent properly points out, expert testimony should be admitted in the precise situation presented to the trial court in this case — that is, when there is no other inculpatory evidence presented against the Defendant with the exception of a small number of eyewitness identifications. *See Smith*, 736 F.2d at 1107; *Moore*, 786 F.2d at 1313; *Downing*, 753 F.2d at 1226.[4] Here, eyewitness testimony was the crucial, if not the sole basis for Smithers's conviction.

---

Smithers's neck." We agree with the government that this was poorly chosen wording, and that no expert may testify as to what witness did or did not see. In a case heavily dependent upon eyewitness identification, such testimony could usurp the jury's function and produce an improper comment on the ultimate issue to be decided in the case. The district court, however, did not even mention, much less base its decision on the language in this sentence. Even if it had, the proper solution would have been to excise the inappropriate portion of the proffer rather than to exclude all of the testimony, the remainder of which dealt only with the psychological factors which may have impacted the perception and memory of the witnesses in this case. This evidence would have been both relevant and helpful to the jury.

[4] As one commentator has indicated:

[t]here are some indications of a compromise position that would be more favorably inclined toward [eyewitness identification] testimony when specific factors of need arise. Where identification rests on testimony by someone who knew the defendant well and was in a good position to see the crime, or where the identification seems strongly established for other reasons (like physical evidence connecting defendant to the crime), there is little reason to admit such testimony. Where identity is a crucial and closely contested issue, however, and where critical testimony is given by people who did not know the perpetrator and had only a short time to see him or were limited or distracted by other factors, expert testimony seems more clearly warranted.

CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, EVIDENCE, § 6.37, at 601 (1995).

The district court in this case concluded that "[a]dmission of Dr. Fulero's testimony is in this case is almost tantamount to the Court declaring the defendant not guilty as a matter of law. . . . absent the eyewitness testimony I don't think there's enough here to go to the jury." The lower court did not seem to realize that eyewitness expert testimony is most appropriate in such situations.[5]

The district court should have conducted a hearing under *Daubert* and analyzed the evidence to determine whether Dr. Fulero's proffered testimony reflects scientific knowledge, and whether the testimony was relevant and would have aided the trier of fact. Based on its failure to perform the correct legal analysis—the *Daubert* analysis—as well as its "experiment" rationale for excluding the testimony, we find that the district court abused its discretion. We therefore **REVERSE** Smithers's conviction and **REMAND** this case for proceedings in accordance with this decision.[6]

---

[5]Presumably, the district court was trying to express that the expert testimony would be unduly prejudicial. This conclusion is flawed. First, as the *Smith* Court noted, "in reviewing a 403 balancing [in a criminal case], the court must look at the evidence in the light most favorable to the proponent, maximizing its probative value and minimizing its prejudicial effect." 736 F.2d at 1107. The district court did not apply this standard here. Second, it appears the trial court thought the expert nature of the testimony would unduly impress the jury; this is an improper factor upon which to exclude expert testimony, for if this were the test, no expert could *ever* testify. The court erred in concluding that merely because testimony is given by an expert, it must be excluded.

[6]Smithers also appealed his conviction on two other grounds: (1) the district court's exclusion of a portion of the testimony of Smithers's wife on relevancy grounds, and (2) the district court's response to questions posed by the jury after it began deliberating. Because we have remanded this case for a new trial based on the district court's failure to conduct a *Daubert* test before excluding the eyewitness expert's testimony, these additional issues are moot.

"Admittedly, Your Honor." A lengthier conversation on the merits of the testimony ensued, followed by the court's decision to continue to exclude the testimony, primarily because of the delay.

Federal Rule of Evidence 403 permits relevant evidence to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, *delay*, waste of time, or needless presentation of cumulative evidence." (emphasis added). A district court has "very broad" discretion in making this determination. *See United States v. Hawkins*, 969 F.2d 169, 174 (6th Cir.1992). A *Daubert* analysis includes a consideration of Rule 403, *see Daubert*, 509 U.S. at 595; *Rincon*, 28 F.3d at 925, and several courts have held that Rule 702's "helpfulness" inquiry incorporates Rule 403's concern for undue prejudice. *See Hall*, 165 F.3d at 1104; *Kime*, 99 F.3d at 884; *Curry*, 977 F.2d at 1051. The district court was well within its discretion to refuse to require the Government to prepare a response to an expert witness when the first inkling of what the witness would testify to was not given to the Government until the middle of the trial, after the Government had rested its own case. There is no basis for the majority's holding that Smithers's initial motion—which did little more than introduce Dr. Fulero and his field of study—or his renewed motion at the start of trial, or his mid-trial brief, put the Government on sufficient notice of the substance or foundation of Fulero's testimony so as to permit the Government to prepare a rebuttal, either to the motions or the testimony. The consequences of Smithers's procrastination should rest on him, not on the Government. Other courts have held that initial notice of the intent to call an eyewitness identification expert witness only a few days before trial is grounds for exclusion. *See Dorsey*, 45 F.3d at 816 (remarking "the case law is clear that it is not an abuse of discretion . . . to disallow expert testimony where a late proffer of evidence by the defense substantially prejudices the government in its ability to find its own expert and conduct similar testing" and upholding exclusion when notice given on first day of trial); *Curry*, 977 F.2d at 1052 (upholding exclusion when 4 days

me his curriculum vitae . . . . I'd be happy to entertain [an instruction.]" It was after this exchange that Smithers asserted for the first time that Fulero would "testify to the specifics of the case and explain to the jury that there are scientific studies that have shown that eyewitness identification is flawed." Smithers still did not, however, cite a specific theory or fact in the case to which these "scientific studies" would relate. The court then concluded that "[none of the cases] cited to me . . . suggests that this is admissible evidence. The government's brief is very persuasive, *and I don't have a report from the expert*. No, I think . . . you're asking him to comment upon Debra White's credibility." (emphasis added). Smithers conceded the motion and asked permission to proffer the evidence. The court agreed, and although it offered several times to accept an oral proffer at that time, Smithers insisted on delivering it in writing.

It was in the written proffer, which was not filed until after the Government had rested its case and immediately before Smithers rested his, that Smithers first made any colorable attempt to tie Dr. Fulero's testimony to the facts of the case. Smithers identified the stress of the robbery, "detail salience" relating to Smithers's scar, the length of time between the robbery and the trial, the "conformity effect" of subsequently received information, the photo spread methodology,[5] and the relationship between the witnesses' confidence and accuracy as relevant subjects for Fulero's testimony. Smithers also took issue with the adequacy of a jury instruction in counteracting the fallibility of eyewitness identifications. Smithers had made *none* of these arguments before this point in the proceedings, either orally or in writing, despite several opportunities to do so. It was in this context that the court held another hearing on the motion, and remarked, "you finally got your act together with this latest filing . . . . Much different from the first filing," to which Smithers responded,

---

[5]Smithers now proposed to have Fulero testify to the efficacy of the photo spread, despite having no response to the Government's observation in its prior brief that Smithers had thus far proposed no such thing.

---

**DISSENT**

---

ALICE M. BATCHELDER, Circuit Judge, dissenting. I would hold that the district court's decision to exclude Dr. Fulero's testimony should be affirmed on the basis of Smithers's delay in proffering it in its specifics to the court and Government. If we are to reach the merits of the decision, however, I am not nearly so certain as the majority is that the court did not perform the proper legal analysis. Certainly we should make that decision on the basis of a review of the entire record and not, as does the majority, largely on the basis of a handful of unfortunate but irrelevant remarks by the district court. In any event, once we have decided, as the majority has, that the court did not perform the proper *Daubert* analysis, our response should be to remand the issue for a proper hearing. We should not proceed to do that analysis ourselves, nor should we issue what is essentially a blanket endorsement of expert testimony on a subject deserving of, at best, our careful and skeptical scrutiny, effectively warning the district courts in this circuit that in the future it will be an abuse of discretion *not* to accept such experts. For these reasons, I must dissent.

### I. Delay

As the majority noted, the district court's primary reason for denying the renewed motion to permit Fulero to testify was that it was made "too late in the day." In reasoning that Smithers's initial motion *in limine* put the Government on sufficient notice of Fulero's testimony, the majority makes no mention of the paucity of detail which that motion contained. Furthermore, the legal foundation of the majority's reasoning is, in my view, erroneous.

A brief overview of the appellate courts' reception of expert testimony on the fallibility of eyewitness identifications is necessary in order to explain the inadequacy of Smithers's

initial motion. The majority correctly observes that for approximately the first decade or so in which such testimony was submitted, courts were "uniformly skeptical . . . for a host of reasons." These reasons included distrust of the science behind the testimony, a concern that the majority goes to considerable lengths to dispel. But this was hardly the only reason given for disallowing the testimony, and that skepticism rightly continues in the appellate courts today. The majority opinion in this case acknowledges some of these decisions, but sidesteps the unanimous hesitancy among appellate courts to open the door too far to this testimony. In many cases, the excluded testimony is either a generic, scholarly exploration of psychological theory, bearing little relation to the facts of the particular case, *see*, *e.g.*, *United States v. Brien*, 59 F.3d 274, 277 (1st Cir. 1995); *United States v. Rincon*, 28 F.3d 921, 925 (9th Cir. 1994); *Jordan v. Ducharme*, 983 F.2d 933, 939 (9th Cir. 1994); *United States v. Blade*, 811 F.2d 461, 464-65 (8th Cir. 1987); *United States v. Fosher*, 590 F.2d 381, 382-83 (1st Cir. 1979), or else so specifically directed at the validity of a particular witness's testimony as to usurp the jury's role in determining credibility, *see*, *e.g.*, *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999); *United States v. Hall*, 165 F.3d 1095, 1107 (7th Cir. 1999); *United States v. Kime*, 99 F.3d 870, 884 (8th Cir. 1996); *United States v. Dorsey*, 45 F.3d 809, 812 (4th Cir. 1995); *United States v. Moore*, 786 F.2d 1308, 1311-12 (5th Cir. 1986); *United States v. Langford*, 802 F.2d 1176, 1179 (9th Cir. 1986); *State v. Gaines*, 926 P.2d 641, 645 (Kan. 1996); *State v. Sabetta*, 680 A.2d 927, 933 (R.I. 1996). In either situation, even though the testimony may have provided some measure of insight that the jury otherwise would not have possessed, the risk of the jury's being unduly swayed by testimony with the imprimatur of scientific expertise has been deemed significant enough that the decision to exclude it could not be considered an abuse of the trial court's considerable discretion with regard to evidentiary matters. This is especially so in light of the fact that the more traditional methods of exposing the fallibility of eyewitness identifications—cross-examination, jury instruction and closing argument—are more efficacious and far less risky

confidence relationship, etc.) may be applicable in the situation at hand. The memorandum's attachments—Fulero's vita and a selection of journal articles on the topic—plainly did nothing to provide the needed specificity. The Government made precisely this point in its response memorandum,[4] and cited a number of authorities suggesting that cross-examination and jury instructions were better alternatives. At the hearing, the court began the discussion by opining that "the government writes a pretty persuasive brief. You can argue to the jury people make mistakes all the time. You can bring out the discrepancies [through cross-examination and a jury instruction]." Smithers responded by defending the scientific validity of the testimony. The court asked, "Has [the expert] rendered a report?" Receiving a negative response, the court continued: "I would have to go through a long voir dire ahead of time. I think if you're going to have an expert you've got to have a report. You've given

---

clearly inapplicable in this case. *Daubert* cited as an example of scientific testimony the Seventh Circuit's treatment of spectrographic voice identification technique. One method of examining this technique's reliability was to ask how often it produced an erroneous result. Here, the proposed "technique" is of the exactly opposite type; it seeks not to make an identification, but to explain the reasons why an identification may be incorrect. Hence, a proper analogy to this *Daubert* observation might be to ask how often this technique correctly ascertains that an identification is wrong.

Nevertheless, Smithers continued: "[T]he question of known rate of error is addressed by the [Handberg] article included as Attachment C . . . . This article analyzes in detail the effect that certain variables are likely to have on the ability of eyewitnesses to correctly identify persons they have previously seen, pointing out the rate of error in making identifications. [This] forms parts of the scientific basis of Dr. Fulero's testimony." This passing reference was Smithers's entire treatment of the "rate of error" issue, and does not provide the needed specificity.

[4]The Government noted that "Fulero's testimony . . . would likewise be of dubious assistance to the jury. His testimony does not relate to a specific fact in this case, such as the efficacy of the photo spread. Instead, defendant will offer his testimony regarding the general problems arising from eyewitness identification, in contrast to the specific issues that were presented in the *Smith* case."

*Stevens*, 935 F.2d at 1397 (quoting *Downing*, 753 F.2d at 1242).[1] The *Downing* court remanded its case for a proper Rule 702 hearing on the proposed expert testimony, because the district court had merely held a brief sidebar on the issue on the tenth day of trial without a voir dire of the witness or any time for either party to present its view. *See Downing*, 753 F.2d at 1228.[2] Here, however, the district court properly held a pretrial hearing on various motions *in limine*, including this one, but the content of Smithers's supporting memorandum was woefully inadequate to enable the court to exercise its discretion in an informed manner. The 10-page supporting memorandum recited the applicable standards of *Daubert* and Rules 702 and 403, defended the legitimacy of Dr. Fulero's field of study and academic qualifications, and included a few paragraphs indicting the reliability of eyewitness identifications in general. It contained absolutely no attempt to explain how the testimony would relate to the facts of the case or which of the psychological theories on memory[3] (e.g., stress, "forgetting curve," accuracy-

---

[1] Contrary to the majority's characterization of this citation, I do not offer this quotation as a "holy writ" or rigid "test" that the district court should have adhered to, but rather as a common-sense explanation of Smithers's burden to establish the relevance of his proffered testimony to the case. For this reason, the *Stevens* court's reasoning—or, for that matter, the identical emphasis on specificity in our *Smith* decision— is made no less valid by the fact that it pre-dates *Daubert*.

[2] Tellingly, the district court on remand again dismissed the testimony, this time as unhelpful to the jury and more prejudicial to the prosecution than it was probative to the defense. *See* 609 F.Supp. 784 (E.D. Pa. 1985). The judgment was affirmed without opinion. *See* No. 85-1359, 780 F.2d 1017 (3d Cir. Nov. 25, 1985) (table).

[3] The only assertion made in this memorandum that could arguably be considered "specific" to Fulero's testimony in this case is the reference to the "known rate of error." This brief discussion actually originated from Smithers's recitation of the *Daubert* analysis. Smithers was "unclear how the third step in the *Daubert* analysis, reviewing the rate of known error, would apply to this form of scientific testimony." Not only is this rate-of-error inquiry not a "step" mandated by *Daubert* but simply one of its "general observations," *Daubert*, 509 U.S. at 593-94, it is also

---

than expert testimony that can at best be only marginally relevant to the facts at hand. *See Moore v. Tate*, 882 F.2d 1107, 1110-11 (6th Cir. 1989); *Hall*, 165 F.3d at 1107; *United States v. Smith*, 122 F.3d 1355, 1358-59 (11th Cir. 1997); *United States v. Hicks*, 103 F.3d 837, 847 (9th Cir. 1996); *Kime*, 99 F.3d at 884; *United States v. Ginn*, 87 F.3d 367, 370 (9th Cir. 1996); *Rincon*, 28 F.3d at 925-26; *Jordan*, 983 F.2d at 938-39; *United States v. Curry*, 977 F.2d 1042, 1051 (7th Cir. 1992); *Blade*, 811 F.2d at 464-65; *Moore*, 786 F.2d at 1311-12; *Fosher*, 590 F.2d at 382; *State v. McClendon*, 730 A.2d 1107, 1115-16 (Conn. 1999); *McMullen v. State*, 714 So.2d 368, 370 (Fla. 1998); *Gaines*, 926 P.2d at 662-63; *State v. Buell*, 489 N.E.2d 795, 803-04 (Ohio 1986); *Currie v. Commonwealth*, 515 S.E.2d 335, 339 (Ct. App. Va. 1999). The grounds on which these courts have explained their rulings vary—the testimony was unhelpful, the subject was within the jury's common knowledge, the subject was not a proper one for expert testimony under Evidence Rule 702 or some analogous test, or the prejudice substantially outweighed the probative value pursuant to Rule 403—but the results were the same.

I will concede that the concept of expert testimony on the subject of eyewitness identification, and the scientific research behind the testimony, has gained some acceptance and respect in our courts since it was introduced. But the majority's own recounting of the case law on this subject reveals that the appropriateness of using such testimony in court—instead of its traditional alternatives—to counteract the deficiencies of eyewitness identifications is still very much in controversy, for all of the reasons detailed above. The recent trend has been towards allowing the testimony in a limited number of "narrow circumstances," but this merely reflects the liberality of Rule 702 and the gradual maturing of the research, not the "dramatic transformation" of judicial attitudes that the majority claims. *See United States v. Smith*, 156 F.3d 1046, 1052 (10th Cir. 1998) (holding that cross-examination and common sense will presumptively suffice outside the "narrow circumstances [of] cross-racial identification, identification after a long delay, identification

[...] under stress, and [...] the feedback factor and unconscious transference"); *United States v. Harris*, 995 F.2d 532, 535-36 (4th Cir. 1993) (same); *Currie*, 515 S.E.2d at 338 (same); *Brien*, 59 F.3d at 277 ("a door once largely shut is now somewhat ajar"). Some of our sister circuits expressly retain their jaundiced view of this type of testimony. *See Hall*, 165 F.3d at 1104 ("This Court has a long line of cases which reflect our disfavor of expert testimony on the reliability of eyewitness identification"); *Smith*, 122 F.3d at 1357 ("This Court has consistently looked unfavorably on such testimony"). Every court to address the issue has left the admissibility of the testimony to the sound discretion of the district court on a case-by-case basis, either on the authority of *Daubert*, Rule 702, or an analogous state rule. No appellate court has adopted a presumption or per se rule in favor of admitting eyewitness identification expert testimony, something the majority's opinion comes dangerously close to doing. Many courts have expressly disavowed such a rule. *See Smith*, 122 F.3d at 1359; *United States v. Alexander*, 816 F.2d 164, 169 (5th Cir. 1987); *Blade*, 811 F.2d at 465; *Langford*, 802 F.2d at 1179; *Sabetta*, 680 A.2d at 933.

Moreover, the only federal appellate decisions finding the exclusion of this type of expert testimony to be an abuse of discretion are readily distinguishable from the instant case. In *United States v. Stevens*, 935 F.2d 1380, 1397 (3d Cir. 1991), the Third Circuit reviewed a district court's decision to admit the expert's testimony as to some psychological theories but not others. The dangers of the expert's testimony in general, then, were not at issue. The panel reversed because it found no reason why the excluded theories did not "fit" the facts of the case as much as those that were admitted. In *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985), the district court erroneously excluded the testimony per se instead of performing its gatekeeping function. In this circuit's *Smith* decision, the Government conceded Dr. Fulero's expertise, *see* 736 F.2d at 1105, and the proffer there specifically tied the theories of transference and cross-racial identification to the facts of that case. *See id.* at 1106. We used this specificity to distinguish *Fosher*, which was

representative of the cases finding expert testimony too removed from the particular facts to be helpful. *See id.* The lack of specificity in Smithers's proffer likens this case to *Fosher* far more than to *Smith*. Apart from this distinction, the majority opinion's characterization of *Smith*'s holding is troubling. At most, this court said in *Smith* that Dr. Fulero's testimony on the reliability of eyewitness testimony *might* meet the *Green* criteria, and *might* have been improperly excluded. We did not, as the majority opinion claims, express our "acceptance of psychological studies as a scientifically sound and proper subject of expert testimony, noting, '[the] science of eyewitness perception has achieved the level of exactness, methodology and reliability of any psychological research.'" What we noted is that Dr. Fulero had testified to that effect, *see id.*, and, in the final analysis, held that "*even if it were error* to exclude the expert's testimony, such error was 'harmless.'" *Id.* at 1106-07 (emphasis added). It is also worth noting that the analysis in *Smith* was not unanimous; the concurring judge did not find an abuse of discretion. Since the *Smith* case, no Sixth Circuit decision has reversed a district court's exclusion of expert testimony on eyewitness identifications as an abuse of discretion.

I will address in a later segment of this dissent my view of this testimony's utility, but for now it suffices to say that because the range of circumstances in which this testimony should be admitted is so narrow, the party offering it should be required as a threshold matter to make

an on-the-record detailed proffer to the court, including an explanation of precisely how the expert's testimony is relevant to the eyewitness identifications under consideration. The offer of proof should establish the presence of factors (e.g., stress, or differences in race or age as between the eyewitness and the defendant) which have been found by researchers to impair the accuracy of eyewitness identifications.